The case we are going to hear this morning is Pace v. Air & Liquid Systems and Mr. Sweat, whenever you are ready, we will hear from you. Mr. Sweat, on behalf of Christine Pace, this is an appeal from a final judgment entered by the District of South Carolina after the case was remanded back to that district from the Asbestos MDL in the Eastern District of Pennsylvania. Just a brief procedural statement of the relevant procedural history. This case arose from Mr. Pace's diagnosis of mesothelioma and subsequent death. It was originally filed in state court, removed to the District of South Carolina, and then Pennsylvania. While it was in the MDL, Judge Rubino issued four interlocutory decisions granting summary judgment to the four appellees. The case was subsequently remanded back to the District of South Carolina. A bench trial was held as to the liability of John Crane, a separate defendant only. There were stipulated damages as to John Crane only. A final judgment was entered and then a timely appeal followed in this court from the final judgment. Was there really a trial or did you all just stipulate everything? There were stipulated damages and a bench trial just on the liability of John Crane. It looked like a restipulation of facts, too. There were some stipulations. It was a bench trial, it was a loose proceeding, Your Honor. So I guess the first issue- But we're only reviewing the four summary judgments entered earlier by the MDL court. Yes, Your Honor. Okay. No issues for the South Carolina court. All the issues come from Philadelphia. Yes, Your Honor. So the first issue, jurisdiction is challenged, so that's the first issue that I should address. And I believe the precise issue before this court is whether this court is precluded from reviewing on appeal from final judgment entered by the District of South Carolina the question of whether the Eastern District of Pennsylvania's interlocutory decisions was a correct application of law. And so the first point I'd like to make in this respect is that this court has jurisdiction of this appeal because the final decision was entered by the District of South Carolina. 28 U.S.C. 1291 provides that appellate courts have jurisdiction of final decisions. The conduct was in South Carolina, the suit was filed in South Carolina, it was transferred to the MDL for pretrial proceedings under the language of the MDL statute, transferred back to South Carolina, final judgment entered, and you took an appeal. Yes, Your Honor. And precisely on appeal from final judgment, this court has jurisdiction to review whether an interlocutory decision by a district court in another circuit was a correct application of law. And again, we rely on 28 U.S.C. 1291, 28 U.S.C. 1294, and then the reasoning in Technosteel v. Beers Construction Company. For the record, I'll cite, the cite is 271 F. 3rd. 151. Well, what's the argument we don't have jurisdiction? We appeal final judgments, handle final judgments. The MDL is a judicial efficiency statute that collects all these things together in preparation for the trial and theoretically sends them back. Now, if the MDL court disposes of it by interlocutory orders, that merges into the final judgment. Correct, Your Honor. And that's our position. Yeah. Why don't we let them present their argument on that? Moving to the Eastern District of Pennsylvania's actually application of the Warman's Standard in granting summary judgment. Because Ms. Pace presented evidence that Mr. Pace was exposed to the appellee's asbestos-containing products on a regular basis during the time that he worked in both Shop 31 and 38 at the Did she ever present specific testimony with respect to regularity or frequency? She certainly established proximity in some instances. But the testimony, if you look at the testimony of coworkers, it was very spongy. It was Mr. Pace worked around certain machines at certain periods of time. I don't recall, and perhaps you can help me, particularly the frequency and regularity components of Warman. Yes, Your Honor. And if I may, I will address by specific defendant or specific appellee. With regard to Crane Co. Pumps. Now, Crane, you're picking up first. Is that the one you think you got the best case on? Your Honor, in all honesty, it probably flows Crane Co., Goulds Pumps, Westinghouse, and then Buffalo Pumps in order of strength of evidence. With respect to Crane Co., Mr. Pace primarily worked in Shop 38, which was in Building 80. That's a specific place at the Charleston Naval Shipyard that he worked. He worked in Building 80. Coworker Raymond Lee. He worked on the ship, too, didn't he? And that's excluded from this consideration? Yes, Your Honor, because we're only appealing the application of South Carolina Substantive Law. Yeah. So, I mean, that goes to this overall issue that Judge Duncan's asking about. If, for instance, he worked in Buildings 31 and 38 5% of the time and worked 95% of the ships, hypothetically, I don't know what the numbers are. But that's something that has to be taken into consideration because we can't consider the 95%. And clearly, on the ships, when they were putting the insulation on, it looks to me like those conditions were pretty rough in there. But this is Buildings 31 and 38. You have to show the frequency, the regularity, and the proximity. And then it has to be with respect to Crane products. Yes, Your Honor. Okay. And to respond to that briefly before getting back to Judge Duncan's question, the actual work on the pumps and turbines occurred in the shops. He did go on ships. And primarily, the process on ships is just unshipping the equipment, which is basically taking it out of the line and bringing it back to the shops. And in the shops is where the repairs occurred. Except they, on the ship, they also insulated it on the ship, didn't they? They did insulate it. Applied the insulation. They did. But he was not an insulator. He was a machinist. Yeah. So getting back to Judge Duncan's question with respect to- And you were taking me to the testimony of Raymond Lee. Yes, Your Honor. Raymond Lee worked with Mr. Pace and observed his work in Building 80. He said every year from 1972 to the late 1980s. He testified that they built crane pumps in Building 80. And he also testified Mr. Pace worked on crane pumps a lot. A lot. And he further said, I can't tell you a specific pump or ship that I can remember standing there and seeing him work on. His assessment that the decedent works on the pumps a lot was based on the length of time working at the shipyard. So he extrapolates from the time at the shipyard that Mr. Pace worked with crane pumps a lot. Yes, Your Honor. But he did- He acknowledges that he did not see that or that he cannot speak directly to that. He cannot provide specific recollection of actually seeing Mr. Pace work on a crane co-pump. But that's the same situation that we had in Rowling where all you need is a co-worker's testimony to say this is the product or this is the type of pump that the person worked on, even if you don't remember them working on it. As long as it was worked on and there was asbestos exposure that everyone working site-by-site- But we don't- First of all, with respect to crane, what product are we talking about? We're talking about crane co-pumps. Okay. And he, Mr. Lee, doesn't even recall a specific pump. Mr. Lee does not. For crane co-pumps, he testified, again, that they built crane pumps in Building 80. That was one of the pumps that were worked on. And Mr. Pace worked on crane pumps a lot. He identified crane pumps? Lee did? He named them? He named them, but he did not have a specific recollection of Mr. Pace actually working on a crane co-pump. And it's our position that a specific recollection of actually seeing the individual work on that pump is not needed when you have co-worker testimony basically saying all machinists worked on crane pumps in Building 80 and there was asbestos exposure because the machinists who that was their regular duty to repack and overhaul pumps, which included removing gaskets and packing from pumps, they would have been exposed- How many different kinds of pumps were there? That is not in the record, Your Honor. We do know that one of the co-workers testified that the main pumps that he recalled from the Charleston Naval Shipyard were Goulds pumps and I believe Buffalo pumps. But getting back to- And you also- What percentage of them are crane? I'm sorry. No, no. What percentage of them are crane pumps? Your Honor, we don't know that for- That's not in the record either? No, Your Honor. Again, all we know is that as a machinist, that was his duty to repair and overhaul pumps and we know that crane pumps were worked on by machinists- Did you say that crane pumps produced asbestos? Yes, Your Honor. Co-worker Guy Lukabil worked on pumps with Mr. Pace in Building 80 from 1972 to 1974. He said he worked side-by-side with Mr. Pace. Both he and Raymond Lee testified that the packing used in the pumps at the Charleston Naval Shipyard- Crane pumps? Yes, Your Honor. Well, we're talking about the packing that was used in all pumps contained asbestos. You have to connect Mr. Pace to crane pumps somehow with frequency and regularity. Lukabil identified Buffalo and Gould Pumps. Yes, Your Honor. And Lee was the one who actually said that crane pumps were worked on in Building 80 by the machinists. Again- Mr. Lee did? Yes, Your Honor. Did anybody else say crane pumps were worked on there? Not in the record, Your Honor. Those are- You only got one? You got one witness? Yes, Your Honor. Did Mr. Pace ever- did he say he worked on crane pumps? Mr. Pace did not specifically identify the manufacturers of the pumps that he worked on. You got a witness? I thought he identified Westinghouse. He did mention that he worked on Westinghouse products, that's turbines, Your Honor. I thought Lee said he might have worked on crane pumps. Well- Languages might have. Right, because he couldn't recall a specific pump. He couldn't recall a specific pump that Mr. Pace actually worked on himself, but he did recall that crane co-pumps were worked on by machinists in Building 80. Yeah, but he's- when I asked to identify whether the- Pace, he said that Pace might have, and that's the only evidence we have that he did work on crane pumps, isn't it? That he himself, but again- Yeah, but we have to have somebody else. Well, but from Rowling, I mean, we have that machinists worked on these pumps in Building 80. The removal of packing from these pumps created asbestos dust, which all machinists working side by side would have been exposed to. Somebody else is working on a pump, the asbestos spreads through the air? Yes, Your Honor. By what proximity? How close do you have to be? Do you have any evidence of that? Fifty feet? Well, not in the record, but I mean- Five feet? I mean, what's the- In experience, 20 to 30 feet is usually what experts testify to. In the record? There's no evidence in the record other than one of the co-workers testified that he- testified where machinists are working on pumps and removing asbestos packing, which creates dust, is going to expose other machinists to that dust. Again, both Lookabill and Lee testified that the packing contained asbestos. In prior litigation, getting to the frequency, Blackman, co-worker Blackman, who worked in the same shop during the same time period, testified that the packing was changed in these pumps during every overhaul. Not crane pumps? Not crane pumps. All pumps. Well, I know, you know, the problem is we flip around. We have at least at issue Buffalo pumps, crane pumps, Goulds pumps, and maybe others. They said one- Lee said there were a lot of manufacturers of pumps. And the question is now we're trying to hold crane responsible for Pace's injury. And so I don't think Lee could pin it down. I mean, he said it might have happened. But it was pretty dicey to try to get Lee to carry you over the hump. But we have to look at it again and read it. You got any cases where they got to go to the jury with evidence similar to this? Your Honor, well, from this court, we would rely on Warman and Rowling. We think there's definitely more evidence here than was in Warman. Rowling basically said you don't have to have a specific recollection. You just have to have co-workers saying that this product was worked on in a specific area and there was exposure to everyone around that. What about the South Carolina court? Your Honor, I'm thinking Garvin was a trial court order that I attached to the addendum. I'm trying to remember the precise... Henderson is a big one, isn't it? Henderson was where the South Carolina Supreme Court actually adopted Warman. I do know that Cranco was a defendant in the Garvin decision that I just mentioned. And I can't recall specifically what the exposure was. That's a trial court decision. That is a trial court decision. Where the judge let it go to the jury. And dealt with all the bare metal issue and all these issues. You got past summary, Judge. Yes, Your Honor. Was that stronger or weaker than this case against Crane? Your Honor, I think it was against Crane. Well, you said Crane's your best case of the four. Well, Crane and Goulds are about on the same level, Your Honor. They're different facts. Crane and Gould are the same. But in Garvin, was the case, in your view, better or weaker than this one? Where you got to go to the jury?  I mean, you had different numbers of witnesses. You had some invoices from the Eastman facility at issue in Garvin. So it was different evidence. Moving quickly, I guess, to Goulds, if I may. So for one year, Mr. Pace worked in Shop 31. Where, again, he worked on pumps. This work included removing packing and repacking the pumps. Additionally, it was the responsibility of the machinists like Mr. Pace. And I realize that my time's out. May I? Was Crane identified in the Goulds situation? I mean, was Goulds identified? Yes, Your Honor. The identification, not specific identification, but the identification was one of the main pumps that the co-worker remembered from the time at the shipyard as a machinist was Goulds pumps. In the machine, in the area, in Shop 38? Let me just be a little more specific. The district court concluded that there was no evidence that the decedent worked with or around Goulds pumps in any machine shop. Much less that he was exposed to asbestos in connection with any Goulds pump. Now what specific evidence do you put forward to rebut that? In the direct response to that is the deposition of Mr. Karst in prior litigation who worked in Shop 31. And he recalls assisting machinists removing portions of Gould pumps. Packing, yes, Your Honor. And he testified that this work generated dust, Joint Appendix 1450. So he did recall that in that shop. And he said prior to 1985, Goulds sold centrifugal pumps with asbestos-containing gaskets and stuffing. And that it was overhauled. Yes, Your Honor. The fact that the Goulds pumps contained asbestos-containing packing and gaskets prior to 1985 is from Goulds pumps' own documents. And help us then with proximity, frequency, and regularity. So you have Mr. Pace worked in Shop 31 for one year. He was a machinist. His primary duty was removing packing from pumps. And then you have Mr. Karst's testimony that during the same time period when he worked in Shop 31, he assisted machinists removing all portions of Goulds pumps, including packing, which created dust. Right, and he didn't, as I recall, he recalled assisting machinists generally removing portions of Goulds pumps. Right, which would fall under Rowling. We don't dispute, there's not a specific recollection of an eyewitness worker saying, I saw Mr. Pace work on X pump. Our position is that Rowling, we're going under Rowling here, which we think is right on point. We don't have the specific recollection of him working on a specific pump. They didn't have that in Rowling? They did not have that, Your Honor. What they had was co-workers basically saying, this is pumps that machinists worked on in this area, and all the machinists would have been exposed to this asbestos dust.  We rely on the evidence as it is, but additionally we say that Mr. Pace was exposed to asbestos from these pumps and these products from other machinists working on these pumps and releasing that asbestos dust into the air. And I will, unless there are other questions, I will reserve for rebuttal. All right, Ms. Kennedy. Who do you represent? Good morning, may it please the court. I represent CBS Corporation. Yes, and I'll be speaking for the first eight minutes about the legal framework and its application to CBS and then counsel for the other three. We're pretty familiar with legal. You can address it, but go ahead. And one of the things I would like you to address is opposing counsel's reliance on Rowling, which I may read just a little bit, because it says that the evidence need only establish that plaintiff was in the same vicinity as witnesses who can identify the pumps causing the asbestos dust that all people in that area inhaled. And that's the exposure component, but does that speak to all of the components of law? So I think Rowling certainly speaks to the proximity point. It doesn't speak as much to the regularity and frequency point. But in Rowling, the critical component was that the plaintiff was in the same limited area working side by side as other people, all of whom were inhaling asbestos dust in that limited area. From the same source? Yes, from the same source. Shop 38 is not a limited area. As Mr. Morgan testified, Shop 38 was comprised of two buildings, of two large football fields each with two levels, and there were over 500 machinists working in there. Other witnesses likewise testified that machinists worked on different things. Some of them had different specialties. So for instance, Mr. Pace testified when describing his primary job description that he worked on other types of equipment, not turbines. Now Westinghouse is only in this case for turbines. So there's no evidence from Mr. Pace himself that he worked on Westinghouse turbines. In fact, the only evidence in this record that Mr. Pace worked with Westinghouse turbines at all comes from Mr. Lee's testimony. Mr. Lee testified that he and Mr. Pace... The judge of Philadelphia said he worked on something that Westinghouse made. So, you're right, the Judge Robrano's opinion says that, but if you look at the portions of the testimony from Mr. Pace's deposition, he testified only that he recalled as a general matter that he worked on some Westinghouse equipment. I think it's called Westinghouse condensers? Yes, exactly. He testified that he worked on... And turbines. He worked on Westinghouse turbines and condensers. Judge Robrano's opinion does recite that, which is from the plaintiff's opposition to summary judgment at the site of the deposition testimony. He cites it in his opinion. Exactly, but... He says that in his opinion. So Mr. Pace's deposition testimony does not actually say that, but even if it did... The statement of the facts is not in accord with the deposition. Well, I thought he concluded that there was evidence that DeSeton had worked on Westinghouse turbines. There absolutely is, and that's where Mr. Lee and Mr. Lee testified that he and Mr. Pace worked on Westinghouse turbines maybe once or twice. He didn't specify whether that work was on a ship as opposed to in CHOP 38. Well, he said it wasn't clear that those... that the installation of insulation, which occurred in Pace's presence, created asbestos dust, since there's no evidence that Pace was near a Westinghouse turbine when the insulation was being removed. Exactly, so Mr. Lee did not testify that any of the work that Mr. Pace performed on the one or two Westinghouse turbines exposed him to asbestos dust. But even if it did, one or two exposures is simply not enough under South Carolina law. This court, applying the regularity, frequency, and proximity test in Mormon, held that 10 to 15 exposures of one to eight hours each is not sufficient. So certainly one or two exposures or other de minimis amounts of exposure likewise fail. Now, we can't assume that Mr. Pace was working on Westinghouse turbines more than this, because Mr. Lee, who plaintiff has emphasized, worked side by side with Mr. Pace and worked with him a lot, said that he only worked on three turbines total with Mr. Pace, and only one or two of those was a Westinghouse turbine. Other witnesses, such as Mr. Franchette, on whom plaintiff also relies, testified that he only saw Mr. Pace working around turbines twice, and both of those turbines were manufactured by someone other than Westinghouse. So there's no evidence here that Mr. Pace was working around turbines more than these one or two times. We also can't assume that he was working around other people who were exposed to asbestos dust from Westinghouse turbines. The plaintiff relies primarily on intent deposition testimonies. As an initial matter, that evidence is inadmissible because the vast majority of pages that the plaintiff cites were not before the district court and were not attached to the district court record. That testimony is also inadmissible because CBS did not have a similar motive to examine those witnesses about asbestos dust in the specific area where Mr. Pace worked. But even if this court could consider all of that evidence, it doesn't help the plaintiff's claims. Mr. Tan's testimony relates exclusively to asbestos dust on ships, which are not at issue here. And Mr. Sneed, although he testified that some Westinghouse turbines were sent to Shop 38 for electrical work, never testified that that work involved exposure to asbestos dust, and even if it had, Shop 38, again, is not a limited area. It's not the same situation as Rowling where these people were... Limited area, do you mean enclosed? Or small? I think it would probably be both, small and enclosed. Rowling doesn't specify exactly... I think the assumption is that it wasn't in open air there, but we don't know for sure what the exact setup was in Rowling. What we do know is that it's very different from here, where you have a shop that is literally two buildings of two floors of two football fields each with 500 people working in it. It simply is sheer speculation to assume that when a Westinghouse turbine was sent to that shop, Mr. Pace, who none of the people who worked with him saw him working on Westinghouse turbines, so it's sheer speculation to assume that he was around that work. Now, the plaintiff has also argued for a more relaxed standard in the mesothelioma context. As an initial matter, the South Carolina Supreme Court adopted Mormon's standard in Henderson, which was a mesothelioma case. And for that reason, courts applying South Carolina law have rejected exactly the argument that the plaintiff makes here. But even under a more relaxed standard, one or two exposures or other de minimis amounts of exposure are still insufficient. Even if there were enough exposure evidence here, which there's not, CBS would also not be liable because it did not make or supply any of the insulation that allegedly injured Mr. Pace. It's black-letter tort law that the defendant is only liable for harms caused by products that it puts into the stream of commerce. And this court held in the Bowman case that South Carolina law adopts that principle. So all of you... There's no asbestos on the turbines themselves. It's just insulation around the turbines when they're installed on the ship. Is that what you're saying? The only exposure here is to external insulation, and it's undisputed that the Navy required turbines... I mean, it's not like a pump which has some stuffing in there. The turbine doesn't have, internally, when they're redoing a turbine, it doesn't have asbestos inside it, does it? It's the insulation around the turbine. So the insulation around the turbine is the only asbestos product at issue here. And Mr. Pace admits that he doesn't know who supplied that. Moreover, all of the evidence in this case... The turbines came in without the insulation. Yes, exactly. So they came in uncovered and then the Navy got the insulation. Alright, thank you, Ms. Kennedy. Mr. Ross, I think you're next up. Thank you, Your Honors. Mike Ross for Appley Crane Co. I'm just going to make a few points based on the evidence that I hope will be helpful to Your Honors based on what I've heard so far this morning. Number one, Judge Niemeyer, you asked about, well, since the claim is limited to only what happened in the shop, that's a limited universe of exposures. And I thought about that as I was looking through this record. And I don't know how often Mr. Pace was working on the ships versus in the shop, but one of his co-workers, Mr. Lookabill, said that basically all Mr. Lookabill did was he worked on the ships and Pace helped him 30% of the time. So it's a substantial amount of time he was in these ships, which isn't even an issue. Now, as far as Crane Co., I think it's very notable that Mr. Pace, when he was asked over two days of deposition about all of his asbestos exposures, he didn't utter the words Crane Co. So, if he was working on these pumps, it's not something he remembered. Now, Mr. Lee, a plaintiff's co-worker witness who talked about Crane Co. pumps, as Your Honor pointed out, as Judge Niemeyer pointed out, he said Mr. Pace might have worked on Crane Co. pumps, quote, a lot based on his job description. Now, we suggest that's inherently speculative. But even if this court were to accept that, even if you find okay, it's reasonable to believe Mr. Pace might have worked on a Crane Co. pump, I want to go to a question Judge Duncan asked, which was something like this, and I wrote it down wrong, but it's close enough. We know that Crane Co. pumps caused asbestos exposure, something like that. Do we know that work with the pump caused exposure? No! Absolutely not! There are two components that were used with these pumps that plaintiff says might have caused Mr. Pace an exposure. A gasket product, which is a little sealing device, and a piece of packing, which looks like rope, and it's another type of sealing device. It seals around the stem of a valve or a pump where there's moving metal parts. We don't know what kind of work  he did any. It could have been rebuilding the motor. There's nobody that says he worked with these gasket and packing products. And, we know from Mr. Lee, and this is page 693 of the record, that some of the gaskets and packing used in the shops at the shipyard didn't contain asbestos. So, we have no idea whether even if Mr. Pace worked with Crane Co. pumps, even if he was working with the gaskets and packing, were they the asbestos ones or the non-asbestos ones? No clue, based on this record. And, finally, your honors, I would agree with counsel for CBS that this case, even if you indulge all of this speculation, he worked with the pumps, he worked with the gaskets and the packing, they were asbestos, and it was frequent and regular, and there's certainly no evidence of that. But, even if you go all those steps, it's still undisputed that there's no evidence that any asbestos components that were used with these Crane Co. pumps came from Crane Co. as opposed to being later replacement parts that the Navy installed in the shops. That's what the shops did. And we submit that under Bowman or Baumann, however it's pronounced, that is dead-on analogous to a case like this one, and that without evidence that Crane Co. actually made or sold any of these things, that we have no idea that Mr. Pace even worked with, summary judgment's appropriate for that reason as well. Unless the court has any questions for me, I'm going to sit down. Thank you, Mr. Ross. Mr. Frick, you're up next. Sounds to me like you guys are piling on. I'll try to do a little bit more. Who do you represent? Goulds Pumps, Your Honor. There is no evidence in this case that Mr. Pace was exposed to asbestos in association with a Goulds Pump, much less that there was any exposure on a regular basis over an extended period of time. Because of this, the plaintiffs here, under the guise of circumstantial evidence, are seeking to build a case against Goulds. You can make a case on circumstantial evidence. Right, and what I'm saying is that it's under the guise of circumstantial evidence. It's the guise of circumstantial evidence, Your Honor. A lot of people are doing a lot of time on circumstantial evidence. Sure, but this is sheer speculation. And so, the argument from the plaintiffs' counsel is that you all really in the guise of challenging his arguments, that you've got to have direct evidence. And that's not what we're saying at all. That's not what Judge Rebrano said. You don't need direct evidence. Circumstantial evidence is perfectly appropriate. But here, it is not circumstantial evidence. This is nothing but speculation. This is based on possibilities. Even the rolling opinion, which plaintiffs rely on here, affirmed the granting of summary judgment as to some claims because there was only a possibility of exposure. That is not enough. The plaintiff cannot circumvent the frequency, proximity, regularity, Lorman test by taking speculation and characterizing it as circumstantial evidence. They still need to show evidence of exposure on a regular basis over an extended period of time in proximity to the plaintiff. It's not an easy case for a plaintiff. It sounds to me when you have a shop that has asbestos around which could have been contributed to by a half a dozen manufacturers, the plaintiff then has the difficult task of showing that a particular manufacturer contributed to the particular employee's condition. In this case, we have that possibility in the shop, but we also have the interplay between the shop and the ship where there's some contribution to and maybe more contribution. I don't know. Really, your focus, I guess, is not on the circumstantial, but is on the identification of the products that your client manufactured. I'm happy to address some of the individual witnesses. You almost have to, don't you? Isn't that your case? That there's not a link between his illness and your product? That's exactly right. That's what the law requires. There must be a link between Mr. Pace and exposure to asbestos to Goulds Pumps and it has to be frequent and regular. That is nowhere in this record. If you look at Mr. Pace's deposition, he gave two days of deposition. He never mentioned Goulds Pumps. Did he mention any products by name? I believe he did mention some products by name, but he never mentioned Goulds Pumps. In Roebling, they sent it back for trial. Two defendants that the plaintiff couldn't name. He couldn't remember. Sure, you did have co-workers there. But he had witnesses. Somebody else Right. And I would submit, Judge King, that the situation in Rowling is much different than the situation here. In Rowling, you had a very confined space. You had a known period of time and a specific job taking place. Here, none of the witnesses are able to put Mr. Pace at a specific time frame in a specific area of a shop as opposed to a ship but in a shop around any work on a Goulds Pump. When you look at Shop 31, the plaintiffs want to rely primarily on Mr. Karst. Mr. Karst was never identified as a witness in this case and he's deceased. Now, plaintiffs haven't told us when Mr. Karst died, but if he was available for deposition during discovery here, Goulds was certainly prejudiced by not being allowed to go and depose him. In any event, now that he's deceased, his testimony is inadmissible hearsay. Goulds had no motive to question Mr. Karst about Mr. Pace. Mr. Pace's complaint was filed after the deposition of Mr. Karst. Even if you consider Mr. Karst's testimony, it does nothing here. Mr. Karst says that at some point between 1973 and 1996, he encountered a Goulds Pump in Shop 31. We don't know what year, we don't know what part of the shop, and there's no testimony here that connects Mr. Pace to any of that specific work. There's certainly no testimony that establishes it on a frequent and regular basis. If you look at Shop 38, plaintiffs rely on Mr. Lukabil. Mr. Lukabil mentioned Goulds Pumps and plaintiffs make the claim that Goulds was one of the main pumps at the shipyard. If you look closely at that testimony, what Mr. Lukabil said was that it was one of the main pumps that he discussed with plaintiffs' counsel. I think that's an important point. In any event, Shop 38, we know that this work took place on ship. There is no testimony here that any of this work took place in a shop. The shop, we know from Mr. Morgan's testimony, was two football fields in length and there were two buildings and two stories. So there's no testimony here where you can establish a connection between Mr. Pace and a Goulds Pump and there's certainly nothing that can establish it on a frequent and regular basis. Thank you. Mr. Phillips. Your Honor, Judges King, Niemeyer, and Duncan, I'm Mark Phillips, representing Buffalo Pumps, and I just will suggest that that we were Ditto, right? Ditto, absolutely. Let me, if you please, and if I would do better sitting down, I will. We are one of 31 defendants sued in this case. Judge Rubino specifically applied the rolling decision, which Chris Sweat has tried to weave his case into under a circumstantial evidence standard. The plaintiff himself was deposed over two days and he did name some products. He named specifically Milwaukee Pumps, Cambridge Pumps, and General Electric. He never had a thing to say about Buffalo Pumps, nor did any of the co-workers that were heard from have anything to say about Mr. Pace working with the Buffalo Pump. One thing I want to just make clear, and I think Judge Duncan How many brands of pumps were used there? On a single ship. On a single ship, the plaintiff identified through an exhibit, which is in your record, page 1204, a number of different manufacturers of this equipment. American Blower, Aurora, Combustion Engineering, DeLaval, Foster Wheeler, Gardner Denver, Hardy Tynes, Ingersoll Rand, Leroy Company, Schutte and Kurting, Warren and Worthington. For example, Judge. Again, there was nothing specific as to Buffalo Pumps. Mr. Pace testified that he did work with valves, and pumps, and motors, and generators, and condensers, and nuclear repair machinery, and nuclear refueling machinery, and blowers, and gun mounts, and fire hose directors. That is in the record on page 125. I only want to demonstrate that he was a machinist with a wide variety of tasks. And finally, Shop 38. What I don't want is to labor under the disillusion or misimpression that it's a small shop like a two-car, four-car automotive garage. I know you've heard that you had four football field lengths. That is, actually eight, 600 feet upstairs, 600 feet downstairs, 600 feet next door in a warehouse, 600 feet next door in a warehouse, all linear feet. The difference with Rowling, there the plaintiff worked on a specific boiler as a pipe fitter, installing pipes into the boiler, and he was working alongside insulators who were installing insulation onto the same boiler. Here we've got a wide open workplace over 25 years with four different co-workers and Mr. Pace being examined pretty rigorously, of course, by all the lawyers about whether or not he could put a specific product, whether anybody could put a specific product with Mr. Pace. And that ignores even if he was ever around a Buffalo pump and somebody specifically recalled it, there's still not the testimony of him cracking the pump open, as you alluded to, Judge Niemeyer, and actually being exposed to asbestos. So, to me, this is much more a case that's Rowling, Lohrman being a shipyard case, Lohrman being where the court specifically said that's where, of course, the frequency regularity, proximity analysis was laid out. So, anyway, those are the co-workers. The Lohrman did mention this, that some exposures still could happen, but not there. And finally, there was other testimony regarding the shop, that there were just a lot of different areas of the shop, and that there were different crews within the shop. So, it's an enormous place. The main thing is really got eight football fields of linear feet worth of space. Which one of y'all was supposed to argue the jurisdictional point? CBS Westinghouse, Your Honor. So, I'll pass. Did I quash your argument? I think maybe you did. I thank you all three for your time. Yes. Alright. Do we have some rebuttal now? Yeah, you have some rebuttal, Mr. Sweat. Yes, Your Honor. Thank you. May it please the court. I'd like to just address the regularity and frequency element, because that seems to be the focus. I'd like to point out that at least from our position, it's not sheer speculation. For example, with respect to regularity. Mr. Pace was a machinist, and there is testimony that one of the main duties he had was repacking and removing old packing from pumps. It is a reasonable inference, not sheer speculation, that that is a regular duty that he did. In fact, there's testimony that's a regular duty he did. And it's a reasonable inference that he... How many brands of pumps do you think were in that facility during the period that Mr. Pace worked? Your Honor, the exhibit that Mr. Phillips referenced, he named off a lot of manufacturers. Those were not all pumps. I understand. How many types of pumps? I think from the exhibit... From your knowledge, how many pump brands were there, roughly, in that facility during the period he worked? Based on that exhibit, probably five or six. How many? Anything you know. I know of five or six already. Are there twenty? Ten? I would say ten's probably a good estimate, Your Honor. Ten pumps. Ten makes of pumps. And probably turbines, I would say less, maybe two or three. I know of three that are common in the shipyard. Do turbines have any component of asbestos when they came into the plant? No, Your Honor, but that gets to the issue of... I understand it does, but it seems to me that there's a distinction between that and a pump which comes with the packing, the stuffing, and the gas already. Yes, we do recognize that distinction. So, again, regularity, we would rely on the reasonable inference of what he did on a daily basis, and then when you take that into consideration with the testimony of co-workers that puts the specific pumps at issue here, at least in the same shop where he worked, worked on by a machinist, it's a reasonable inference that as a machinist, those are some of the pumps that he worked on. With respect to frequency, I was reminded from the record that Mr. Pace did work aboard the ship about 30% of the time. That leaves 70% of the time he's working... 70% on land and 30% on the ship? Based on that testimony, if you extrapolate from testimony of that co-worker, then he was in the shops about 70% of the time, which would be a substantial portion of the time. Is machinist the most common job title there? No, Your Honor. It's one of many. There are pipe fitters, machinists... And with respect to the shop, as was acknowledged by one of the appellees, there are different sections of the shops, but the machinists who are working on pumps work in one section of the shop, so they're still working side by side. If one person is working on a pump and there is asbestos dust in the air, the other machinists are going to be exposed in that group working side by side on other pumps. How many products did Mr. Pace work on? He mentioned several. He mentioned pumps, turbines, valves. There were some others, but I would note for the Court that those are really the main ones that contained asbestos. I mean, a blower... I know, but the question is if he worked on 20 other types of machinery, electric motors, and this type of thing, that goes to the problem of regularity and exposure. In other words, he may have worked 100% on two pumps, but his work on the pumps may have been a very small percentage of his overall work. Right, Your Honor, but the testimony would support that one of the primary duties of a machinist, one of the main or regular, I forget the exact testimony, but was working on pumps. From experience, the machinist mostly works on pumps, turbines, condensers, some motors. That type of equipment is sort of the main equipment that a machinist works on. Getting back to rolling, I would note that five months exposure was enough in rolling, and that would coincide with what we know from the scientific and medical literature, which I cited, that in a matter of months, it only takes a matter of months to weeks of exposure to cause mesothelioma. I thought that there was only one source from which asbestos was emitted in rolling. Is that not correct? There were a couple of different brands of thermal insulation. I think in that appeal, there were two defendants that issued. So there were more than one, there was more than one source of asbestos exposure there. But again, the court basically said five months of exposure is enough. Here we have Mr. Pace working in Shop 31 for a year. We have him working over a decade in Shop 38. So we get over the five month mark with his regular duties. If you give the non-moving party the reasonable inferences and draw the facts in our favor, you can conclude that Mr. Pace was exposed to these products on a regular and frequent basis. And I will rest on my brief for the remaining issues. Thank you, Mr. Sweatt. We'll adjourn court sine die and then come down to brief.
judges: Paul V. Niemeyer, Robert B. King, Allyson K. Duncan